J-A11039-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | | |
|---|---|---|---|
| C.L.S. | | : | IN THE SUPERIOR COURT |
| | | : | OF PENNSYLVANIA |
| | Appellant | : | |
| | | : | |
| | | : | |
| | v. | : | |
| | | : | |
| | | : | |
| J.M.S., II. | | : | No. 2058 MDA 2018 |

Appeal from the Order Entered December 3, 2018
In the Court of Common Pleas of Dauphin County
Civil Division at No: 2017-CV-03764-CU

BEFORE: BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY STABILE, J.: **FILED AUGUST 08, 2019**

C.L.S. ("Mother") appeals from the December 3, 2018 order re-affirming the October 23, 2018 order that granted the petition for modification of the existing custody order filed by J.M.S., II ("Father"), with respect to the parties' son and daughter, W.J.S. and H.V.S. ("the Children"), born in June of 2014, and November of 2012, respectively. Upon review, we affirm.

The record reveals the following relevant facts and procedural history. When Father and Mother, formerly husband and wife, separated in the summer of 2016, Father moved to the State of California, where the parties resided from 2011 until September of 2015, and, thus, where the Children were born. Mother remained with the Children in the marital home in Hummelstown, in Dauphin County, until it was sold by the parties at a time

unspecified in the record.[1]  Mother then moved with the Children to Hershey, in Dauphin County.  In January of 2018, Mother moved with the Children a second time to another home in Hershey.

The existing agreed-upon custody order, dated May 23, 2017, granted Mother and Father shared legal custody, Mother primary physical custody, and Father partial physical custody two weekends per month and any additional periods as determined by the parties.  During the summer, Father was granted two weeks of physical custody.  As best we can discern, Father exercised the majority of his partial physical custody at a separate residence in Hummelstown, and the parties had an amicable relationship as it related to the Children.  N.T., 9/6/18, at 87.

On August 2, 2018, when W.J.S. was four years old, and H.V.S. was more than five and one-half years old, Mother filed a notice of proposed relocation wherein she notified Father that she would be immediately relocating with the Children to an address in Columbia, in Lancaster County.  On August 7, 2018, Father filed a counter-affidavit, wherein he objected to the relocation and to modification of the custody order.  In addition, on August 7, 2018, Father filed a petition for contempt and for modification of the existing custody order.  In his petition, Father asserted that Mother relocated with the Children on July 26, 2018, and enrolled them in a different school

_____

[1] The parties were divorced by decree on May 4, 2017.  N.T., 9/6/18, at 46.

district without his consent or approval by the court and in contempt of the existing custody order. Father requested primary physical custody and alleged that he is better able to provide a safe and stable home life for the Children.

An evidentiary hearing occurred on September 6 and 11, 2018, during which Mother testified and presented the testimony of her boyfriend, C.L.J., Jr. In addition, Father testified and presented the testimony of J.M., his fiancée, with whom he resides in California, along with their one-year-old daughter.

Mother testified that, at the end of June of 2018, she informed Father *via* text message that she and the Children will be moving to the home of her boyfriend in Columbia, in Lancaster County, which was 23 miles from her home in Hershey. N.T., 9/6/18, at 8, 47-48. In addition, she informed Father that H.V.S. will be attending Central Manor Elementary in the Penn Manor School District,[2] and W.J.S. will be attending Manor Church, a pre-school. N.T., 9/6/18, at 8, 10. Mother acknowledged that, despite Father's request, she did not provide her boyfriend's surname. *Id.* at 8. She advised Father at his request that her boyfriend's three children also resided in the home. *Id.*

Mother testified that she only met her boyfriend in May of 2018. *Id.* at 84. On cross-examination, Mother did not know her boyfriend's middle name.

---

[2] The record does not reveal H.V.S.'s grade level, but based on her age and alleged educational deficits described *infra*, we presume that she was registered for kindergarten for the 2018-19 school year.

*Id.* at 36-37. Father's counsel established on cross-examination that her boyfriend's full name is C.L.J., Jr. *Id.*

Mother acknowledged that Father did not agree with moving the Children to her boyfriend's home and enrolling them in the Penn Manor School District. *Id.* at 10. Nevertheless, Mother testified that she registered the Children in the aforementioned schools that same week. *Id.* Further, Mother acknowledged that, in registering H.V.S. at Central Manor Elementary, she wrote "no" on the registration form with respect to whether a custody agreement existed for the child. *Id.* at 19-20. Mother testified that she subsequently filed the notice of proposed relocation wherein she omitted the names and ages of her boyfriend and his three children who resided in the Columbia residence.[3] *Id.* at 14-15.

At the conclusion of the hearing, the court found on the record in open court that Mother willfully violated the existing custody order by moving the Children to her boyfriend's residence and enrolling them in a new school district without Father's consent and without giving him minimum notice of 90 days.[4] As such, the court found Mother in contempt and sanctioned her to

---

[3] Mother testified that her boyfriend has two sons, then ages twelve and fifteen, and a daughter, nearly age fourteen, all of whom attend the Penn Manor School District. N.T., 9/6/18, at 61.

[4] As best we can discern, the court found Mother in contempt of the shared legal custody provision, which stated, in relevant part, that decisions concerning the Children's health, welfare, and education "shall be made by

pay Father's attorney fees in connection with the contempt petition and hearing. N.T., 9/11/18, at 272-74. The court memorialized its contempt finding by order dated and entered on September 13, 2018.

By order dated October 22, 2018, and entered on October 23, 2018, the court ruled that Mother's move to Columbia, in Lancaster County, "would not significantly impact [Father]'s periods of custody and is therefore not a relocation as defined by 23 Pa.C.S.A. § 5322(a)." Order, 10/23/18, at 1. Further, the court maintained shared legal custody between the parties. However, effective December 28, 2018, the court granted Father primary physical custody and Mother partial physical custody a minimum of two times per month. The court directed Father to pay Mother's airline travel expense for one visit each month. During the summer, the court granted Father physical custody the first fourteen days and the last fourteen days of the school recess, and Mother physical custody the remainder of the school recess. In addition, the court set forth a holiday schedule.

On November 13, 2018, Mother timely filed a motion for reconsideration in the trial court. The court expressly granted Mother's motion by order dated

---

[the parties] jointly." Order, 5/23/17, at ¶ 1. Further, the provision stated, "Mutual agreement shall be required, in advance, regarding . . . enrollment in or termination of a particular school or school program. . . ." *Id.* In addition, the court found Mother in contempt of the relocation provision as follows, in relevant part, "Neither parent shall permanently relocate if the relocations would . . . result in a change of school for the children . . . without a minimum notice of ninety (90) days to the other parent." *Id.* at ¶ 12.

November 14, 2018, pursuant to Pa.R.A.P. 1701(b)(3)(ii), and scheduled a hearing for November 30, 2018.

During the reconsideration hearing, Mother testified that she and the Children moved out of C.L.J., Jr.'s, home the week prior to Thanksgiving of 2018, and returned to her Hershey residence, where they had lived since January of 2018.[5]  N.T., 11/30/18, at 4, 8.  In addition, she testified that she has "not been seeing" C.L.J., Jr., and that she does "not plan to have any more contact with him." *Id.* at 10, 26.

In addition, Father testified on his own behalf, and he presented the testimony of Officer Timothy Keister, who responded to Mother's emergency telephone call made at 9:20 p.m. on Saturday, November 17, 2018.  *Id.* at 74-75.  Officer Keister stated that, in the emergency call, Mother complained that a male was banging on the outside of her windows at her Hershey residence.  *Id.* at 75.  Officer Keister testified that, upon arriving at the scene, present in the home were Mother, the Children, and C.L.J., Jr.'s twelve-and-fourteen-year-old children.  *Id.* at 76, 78 -79.  Officer Keister testified that Mother informed him that C.L.J., Jr., had been banging on the outside of her windows.  *Id.* at 75-76.  By the time Officer Keister arrived, C.L.J., Jr., had already left "in his own truck." *Id.* at 77.  He explained that Mother and C.L.J.,

---

[5] As best we can discern, when Mother moved into C.L.J., Jr.'s, residence, she listed her home with a real estate agency for purposes of leasing.  She had not entered into a lease agreement at the time she decided to return to the Hershey home.

Jr., had been on a date to Houlihan's restaurant that evening, where an argument ensued. *Id.* at 76. Further, Officer Keister stated, "[Mother] did not feel comfortable with [C.L.J., Jr.,] driving with his two children to take them back to his residence because he had had some drinks, some alcoholic beverages." *Id.* at 76-77.

At the conclusion of the hearing, on the record in open court, the trial court denied Mother's motion for reconsideration. *Id.* at 91-93. By order dated and entered on December 3, 2018, the trial court re-affirmed its October 23, 2018 custody order granting Father primary physical custody effective December 28, 2018, *inter alia*.

On December 19, 2018, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion on January 16, 2019.

On appeal, Mother presents the following issues for our review:

A. Whether the trial court erred in entering a custody order, which on its face, appears to punish Mother for contempt because she moved with the [C]hildren to her boyfriend's home without first notifying Father, despite the fact that the trial court issued a separate order against Mother addressing the contempt[?]

B. Whether the trial court erred in transferring primary physical custody of two young children, ages six (6) and four (4), from Mother to Father in the middle of the school year, when Mother had been the primary caregiver since the [C]hildren were born, and the primary custodial parent since the parties' separation, and when the stated cause of the trial court's concern was no longer an issue as was evidenced at the November 30, 2018 reconsideration hearing[?]

C.    Whether the trial court abused its discretion and committed an error of law in modifying a physical custody arrangement in effect by failing to objectively analyze and properly weigh the sixteen (16) factors listed in 23 Pa.C.S.A. § 5328(a)[?]

D.    Whether the trial court erred in failing to consider Mother's offer to move back to her former residence with the [C]hildren in order to retain primary custody, which Father testified, would essentially resolve his concerns regarding custody[?]

E.    Whether the trial court erred in limiting Father's obligation to pay for travel to California by Mother to only once per month to enjoy custody of the [C]hildren when Father testified that he and his fiancée would gladly pay for *all* of Mother's custodial travel and further testified that they had the financial means to pay for the same[?]

Mother's brief at 5 (emphasis in original).

We review Mother's issues according to the following scope and standard of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting ***Bovard v. Baker***, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the

- 8 -

opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

***R.M.G., Jr., supra*** at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. ***Ketterer v. Seifert***, 902 A.2d 533, 539 (Pa. Super. 2006).

***A.V. v. S.T.***, 87 A.3d 818, 820 (Pa. Super. 2014). In addition,

[T]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer,*** 902 A.2d at 540 (Pa. Super. 2006) (quoting ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)). This Court has explained:

It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, given [sic] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . .

***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (quoting ***Hanson v. Hanson***, 878 A.2d 127, 129 (Pa. Super. 2005)).

The primary concern in any custody case is the best interests of the child. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical,

intellectual, moral, and spiritual wellbeing." ***Saintz v. Rinker***, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted).

The Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340, provides the following enumerated list of factors a trial court must consider in determining the best interests of a child when awarding any form of custody:

### § 5328. Factors to consider when awarding custody.

(a) ***Factors.*** – In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

This Court has stated that, "**[a]ll** of the factors listed in Section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Further,

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written

opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013).

*A.V.*, 87 A.3d at 822-823. Further, this Court has stated, "There is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013).

In this case, the trial court considered the Section 5328(a) custody factors in its opinion accompanying the October 23, 2018 custody order. *See* Trial Court Opinion, 10/23/18, at 2-8. In its Rule 1925(a) opinion, the court explained that it made credibility findings against Mother because she appeared to be "purposefully evasive in answering questions that would place her in an unfavorable light regarding the custody factors." Trial Court Opinion, 1/16/19, at 6. The record supports the court's credibility determinations against Mother in this case. *Id.* at 5-6 (citing N.T., 9/6/18, at 14-15, Defendant's Exhibit 10; *id.* at 26, Defendant's Exhibit 8; *id.* at 56, 84; N.T., 11/30/18, at 7-8, 26, 75).

As such, the court did not weigh any of the Section 5328(a) custody factors in Mother's favor. The court weighed the following factors in Father's

favor: Section 5328(a)(1), (2), (4), (8), (9), and (14).[6] The court found inapplicable Section 5328(a)(5), (7), (11), and (15). The court weighed the following factors in favor of neither party: Section 5328(a)(3), (6), (10), and (13). Finally, the court weighed Section 5328(a)(12) equally between the parties.

On appeal, Mother asserts in her first issue that the court erred to the extent it granted Father primary physical custody as punishment for her contempt of the existing custody order, as described above, and not by properly weighing the Section 5328(a) custody factors. Mother's fourth issue is related insofar as she asserts that the court erred in re-affirming the October 23, 2018 custody order because she and the Children had returned to their home in Hershey by the time of the reconsideration hearing on November 30, 2018. Mother's assertions are premised upon her belief that the subject order was issued solely because Mother moved with the Children to her boyfriend's residence.

In her second and third issues, Mother asserts that the court failed to properly weigh the Section 5328(a) factors. Specifically, Mother asserts that the court should have placed more weight on Section 5328(a)(3) and (10),

---

[6] Contrary to the aforementioned statutory and case law, the trial court did not address Section 5328(a)(2.1). We caution the court against omitting this statutory factor in custody cases. Based on the record before us, Section 5328(a)(2.1) is not applicable in this case. Therefore, we do not vacate the order and remand this matter for consideration of this factor.

the parental duties performed by each party on behalf of the child, and which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child. Mother's assertions are based upon the undisputed fact that she has served as the Children's primary caretaker during their lives.

In her fifth and final issue, Mother asserts that the court erred in failing to order Father to pay for all of Mother's travel to California for the purpose of exercising her partial physical custody. Mother asserts that Father testified he would pay for all of her custodial travel, and that he was capable of doing so.

To the extent that Mother's first and fourth issues are premised upon the court granting Father primary physical custody solely because Mother moved with the Children to her boyfriend's residence, we disagree. In its Rule 1925(a) opinion, the trial court stated that Father credibly testified that he would request primary physical custody even if Mother returned with the Children to Hershey due to the "erratic behavior" she had demonstrated. Trial Court Opinion, 1/16/19, at 7 (citing N.T., 9/6/18, at 132-134, 138, 160). Specifically, Father testified on cross-examination, "The biggest red flag is not telling me -- basically at the end of the conversation with the kids saying, oh, by the way, I am moving. I will not tell you [with whom I will be living]." N.T., 9/6/18, at 134. He continued:

> A.    I think [Mother and I have] been very open. We collaborated [in trying] to give the kids the best life. With her not

telling me a person's last name and hiding everything, lying on an application for school and making those decisions, I questioned the stability of it all. I mean, that's erratic to me.

Q. Are [there] other examples of erratic behavior by [Mother] that you observed other than that[?]

A. Other than [her] moving in with someone after knowing him for a couple months, that's pretty erratic.

Q. I mean, the reason that you're really doing this, objecting to the move, seeking contempt, seeking a modification [of the existing custody order] is because of the move[?]

A. No.

Q. That's not the reason[?]

A. No.

*Id.* at 134-135.

We discern no intent by the court to punish Mother for her contempt of the existing custody order. Rather, the trial court fashioned the subject order after thoroughly analyzing the Section 5328(a) custody factors. Mother's contemptuous behavior impacted the court's analysis insofar as it related to the safety and stability of the Children. As such, the court found determinative Section 5328(a)(4), the need for stability and continuity in the child's education, family life, and community life, and (a)(9), which party is more likely to maintain a loving, stable, consistent, and nurturing relationship with the child adequate for the child's emotional needs.

With respect to Section 5328(a)(4), the court found, "Mother's most current move [to C.L.J., Jr.'s, residence] is her third since the divorce." Trial

Court Opinion, 10/23/18, at 4. The court stated it "has concerns over Mother's stability in her current address [at C.L.J., Jr.'s, residence] as she is not on the deed nor did she present a lease to confirm how long she was to live at the latest address. Her lack of ownership in the property, which is owned by her boyfriend and his father, and her boyfriend's history of abuse with the women in his life, causes serious concerns as to how long it may be before the Children are moved once more." *Id.* With respect to Section 5328(a)(9), the court found, "Mother defended her boyfriend to the detriment of the Children by minimizing his history and the impact of yet another move on the Children." *Id.* at 7.

Regarding the impact on the Children, the court found that the parties' son, W.J.S., suffers from stuttering, which increased after Mother moved with the Children to C.L.J., Jr.'s, residence. *Id.* at 6. The court further found that the parties' daughter, H.V.S., was regressing educationally by not being able to count to twenty, write her name, or make the letters of the alphabet correctly. *Id.* at 6-7.

C.L.J., Jr., testified that Mother lacked any ownership in his residence. N.T., 9/11/18, at 193-94. Further, Mother testified that both the ex-wife and ex-fiancée of C.L.J., Jr., filed Protection from Abuse ("PFA") petitions against him. N.T., 9/6/18, at 37. She also testified that C.L.J., Jr., was charged with simple assault as a result of the incident that gave rise to the PFA order entered against him on behalf of his ex-wife. *Id.* at 62-63.

C.L.J., Jr., testified that a final PFA order was entered against him on behalf of his ex-wife in July of 2013, and it expired in July of 2016. N.T., 9/11/18, at 172. He acknowledged that the PFA order included as a special condition two periods of probation, both of which had a term of six months. *Id.* at 174. In addition, C.L.J., Jr., acknowledged that he subsequently was cited for indirect criminal contempt of the PFA order. *Id.* at 177. With respect to his ex-fiancée, C.L.J., Jr., testified that, although she filed a PFA petition against him in 2017, and a temporary PFA order was entered against him, a final PFA order was not entered on her behalf. *Id.* at 179-184. Rather, he obtained a final PFA order against his ex-fiancée, which remained in effect at the time of the subject proceeding. *Id.* at 205.

Finally, the testimony of Father and his fiancée, J.M., supports the court's findings regarding the negative impact on the Children of the move to C.L.J., Jr.'s, residence. Father testified that W.J.S., the parties' son, recently developed a stutter. N.T., 9/6/18, at 100. He further stated that W.J.S. has started putting "his head down and kind of goes to the corner. . . ." *Id.* J.M., who has known the Children for two years, further explained on direct examination:

Q. [W]here do you see [the Children] emotional[ly] right now?

A. I'm really concerned emotionally where they're at. I see them regressing.

Q. In what way?

A. You know, . . . with [W.J.S.], he's regressing. I can talk physically in the sense he's acting like a big dog when he comes over. He's cowering in the corner. He accidentally dropped milk. He's running. He's lost confidence in looking people in the eye. He is stuttering. Seven stutters before he gets a word out.

Q. [W]hen did you start to notice this?

A. It was recently.

Q. In the last several months?

A. Yes.

Q. Since about June, July?

A. Yes. When it comes to [H.V.S.], she too is running and scared and not looking people in the eye.

N.T., 9/11/18, at 240.

In addition, Father and J.M. testified that they are "alarmed" over H.V.S.'s lack of educational development, then more than five and one-half years old. Specifically, Father testified that H.V.S. cannot count to 20, and she cannot write. He explained, in part, "I feel [she is] regressing. I felt like she was on a good page before. I just noticed it. I mean, she's writing letters upsidedown . . . it's alarming." N.T., 9/6/18, at 91; N.T., 9/11/18, at 232. Based on the foregoing testimonial evidence, we reject Mother's first issue on appeal that the subject order was fashioned to punish Mother for contempt.

Likewise, we reject Mother's fourth issue wherein she asserts that the court erred in failing to consider her return to the Hershey residence. At the conclusion of the reconsideration hearing, the trial court stated on the record in open court that Mother exercised poor judgment in deciding to move in with

C.L.J., Jr. **See** N.T., 11/30/18, at 91. Moreover, the court found that Mother's "poor decision-making continued" which affected the Children's safety and stability despite her testimony that she had returned to her Hershey residence by the time of the hearing. **Id.** at 91-92. Specifically, the court stated, "I am disturbed by the most recent police contact that occurred at the house . . .," described above involving C.L.J., Jr., banging on the outside of Mother's windows at her Hershey residence while the Children were present. **Id.** at 91. The court concluded that Mother had left the Children, then four and six years old, at the Hershey residence with C.L.J., Jr.,'s, twelve-and-fourteen-year-old children while she went out with C.L.J., Jr., which the court found "poor judgment" in particular. **Id.**; **see also** Trial Court Opinion, 1/16/19, at 9. The court concluded:

> I understand [Mother] moving back to Hershey and her desire to take things back to the status quo, but I can't unring the bell that [has] been rung. I hope and believe that the [parties] will be able to co-parent together with the things that we put in place in the order. And I trust that the [C]hildren will be able to be in a stable, loving environment. And that stability is the most important thing for me at this point. And I just don't see that stability if we turn it back to the status quo. . . .

**Id.** at 92. Upon careful review, we discern no abuse of discretion by the court in concluding that granting Father primary physical custody will serve the Children's safety and stability.

It follows that we reject Mother's second and third issues wherein she asserts that the court erred in failing to place determinative weight on her role as the Children's primary caretaker. It is well-settled that trial courts are not

required to give weighted consideration to a parent's prior role as primary caretaker when considering the Section 5328(a) factors. *See W.C.F. v. M.G.*, 115 A.3d 323, 330 (Pa. Super. 2015) (citing *M.J.M v. M.L.G.*, 63 A.3d 331, 338 (Pa. Super. 2013)).

Finally, we reject Mother's fifth and final issue wherein she asserts that the court erred in limiting Father's obligation to pay for her travel to California only once per month because Father testified that he would pay for all of her custody travel. In its Rule 1925(a) opinion, the trial court did not explain its reasoning in limiting Father's financial obligation in this regard other than aptly noting that Father did not testify that he would pay for all of Mother's custodial travel. *See* N.T., 9/6/18, at 94-95. We observe that J.M., his fiancée, testified that she and Father could afford a round-trip airplane ticket twice per month if that is what it took to encourage the relationship between Mother and the Children. N.T., 9/11/18, at 228-229. However, J.M. is not a party in this case, and she does not have financial responsibility for the Children. Further, Mother testified that she receives $8,000.00 per month in child support from Father. N.T., 9/6/18, at 54. We cannot conclude that the court's decision to limit Father's financial responsibility for Mother's custody travel rises to the level of an abuse of discretion. Mother's fifth issue fails.

The trial court carefully and thoroughly considered the Children's best interests. Based on the evidence presented, and in giving due deference to the court's weight and credibility determinations, we discern no abuse of

discretion or error of law by the court in fashioning the subject custody order.

Accordingly, we affirm the order.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/8/2019